CORSER v. SWEET et al.

(Circuit Court, S. D. New York. December 16, 1907.)

No. 9,447.

PATENTS—INVENTION—BUCKLES FOR OVERALLS.

The Corser patent, No. 630,037, for a buckle for overalls, consisting of a buckle for fastening the shoulder straps to the bib, having two diverging buttonhole loops for attachment to buttons on the bib, is void for lack of patentable invention, in view of the prior art. Assuming the patent to be valid, and giving it the broadest construction to which it is entitled in view of the proceedings in the Patent Office, the diverging of the loops is an essential feature of the device and the patent is not infringed by a device in which the loops are parallel to each other.

In Equity. Bill in equity to restrain alleged infringement of United States letters patent No. 630,037, dated August 1, 1899, and granted to Brackett G. Corser for "buckle for overalls."

Macleod, Calver, Copeland & Dike, Clarke C. Fitts, and William A. Macleod, for complainant.

Mastick & Jones (Charles S. Jones, of counsel), for defendants.

RAY, District Judge. The patent in suit does not pertain to a new art, and the patentee cannot successfully claim to be a pioneer. The patent contains two claims, viz.:

"I claim as my invention:

"1. The improved buckle comprising the pivoted bow, the tongues, and the two diverging buttonhole-loops for engagement with two buttons located adjacent to each other, substantially as described.

"2. The improved buckle for use with overalls, comprising the pivoted bow, the tongues, the two diverging buttonhole-loops for engagement with two buttons located adjacent to each other, and the inwardly-bowed sides 8, 8, to insure that the buckle shall remain in engagement with the buttons, substantially as described.

"In testimony whereof I affix my signature in presence of two witnesses."

As to the object of his alleged invention and the necessity for it, the patentee says:

"One defect or drawback of overalls as heretofore made is the fact that the bib has been too narrow to afford complete protection to the clothing of the wearer. It is requisite that the suspender-straps should engage or connect with the upper edge of the bib, close to each corner thereof, in order to hold the said corners elevated and spread out. This latter requirement renders it inexpedient to make the bib as wide at the top as otherwise might be desirable, since too great a spread of the suspender-straps in front occasions a tendency of the suspender-straps to slip off the shoulders of the wearer. Hence in order to avoid a tendency of the suspender-strap to slip off the shoulders of the wearer the bib is made comparatively narrow at the top. If the suspender-straps were buttoned onto the upper end of the bib at a dis-

tance from the corners of the bib, the said corners would roll or turn over and would fail to protect corresponding portions of the apparel beneath the same. The objects of my invention are in part to provide an improved manner for connecting the suspender-straps with the bib, and chiefly to enable the bib to be made wider without occasioning a tendency on the part of the suspender-straps to slip off the shoulders, while holding the corners of the bib out flat and preventing the same from curling or folding over; also, in part, to enable the suspender-straps to be made wider than customary in practice heretofore and in consequence more comfortable."

The patentee also says:

"I make the buckle much wider than the ordinary buckle, and this permits the use of a wider suspender-strap, which last is more comfortable to the wearer of the overalls. Heretofore in practice the suspender-straps of overalls have been made generally from an inch to an inch and a half wide where they rest upon the shoulders of the wearer. In the course of prolonged wear of the overalls these narrow suspender-straps cut into the shoulders of the wearer, thereby occasioning a serious degree of discomfort. The greatly-increased width which I give to the suspender-straps where they rest upon the shoulders of the wearer prevents them from cutting in and renders them entirely comfortable and easy. I form the buckle with two buttonhole-loops, 5, 5, which are separated rather widely apart and which flare or diverge somewhat relative to each other in order to hold the buttons which they engage the proper distance apart, thereby preventing the material of the bib between the loops, 5, 5, from puckering and keeping it smooth at all times. Heretofore I have in some cases made the distance between the centers of the closed ends of the said loops about one and a quarter inches, although this precise distance is not material, and it may be varied from in practice and may be made as much greater or smaller as may be deemed advisable. At each upper corner of the bib, 1, I attach two buttons, 2, 2, or equivalent headed studs or engaging devices, spacing them apart to correspond with the extent of separation of the loops, 5, 5, of the buckle. One of these buttons or equivalents is located at the corner of the bib. The other is at a little distance therefrom. It will be perceived that with the foregoing construction and arrangement increased width of the upper end of the bib is permitted, while the middle line of the suspender-strap will be located precisely where the middle line of the suspender-strap has been located heretofore, so that the suspender-strap will bear precisely as before at the shoulder without tendency to slip off; also, that the outer button and buttonhole-loop cause the outer corner of the bib to be held perfectly flat in the required position, thereby affording the more extended protection to the apparel of the wearer, which I aim to provide for by my invention. The outer sides, 8, 8, of the buttonhole-loops are curved or bowed inwardly, as shown. This guards against accidental disengagement of the buckle from the corresponding button, 2, 2. Should a relative movement take place through any cause between the buckle and the buttons, such movement causing the buttons to occupy a position in the buckle higher up than the position which is represented in Fig. 1, then the inwardly curved or bowed sides, 8, 8, would press in under the buttons, 2, 2, and against the shanks thereof. This acts to prevent accidental disengagement of the buckle from either or both of the buttons with which it co-operates. In order to enable the buttons to be withdrawn from the buckle, it is necessary that the buttons should occupy a position in the buckle up near where the bow is pivoted to the body, and after the buttons come to occupy such position it is necessary that they should be pressed toward each other in order to disengage them from the bowed sides, 8, 8."

The loops of the lower or loop part of this device or buckle are used to "hitch-on-to" the buttons attached to the bib of the overalls, or other garment; for it must be conceded the buckles may be used to hold up and keep in place trousers and other garments as well as overalls, while the prongs or tongues of the buckle and the bow thereof engage with the shoulder straps. By suitable manipulation of

the straps, where they engage with the buckles, the overalls may be raised or lowered, and consequently the straps drawn more tightly or made to fit more loosely over the shoulders of the wearer. It will be noticed that the patentee expressly says "he has invented certain new and useful improvements in buckles for overalls of which the following is a specification," and that, "4, 4, are buckles which are applied in well-known adjustable manner to the suspender straps, 3, 3, the said buckles being provided with buttonhole loops, 5, 5, for engagement with the buttons, 2, 2, 6, 6, are the tongues of the buckle, the same being formed as portions of the body of the buckle. 7 is the bow, it being pivotally connected with the body of the buckle as shown." In short, the loops and the tongues of the buckle are of one piece of metal and the bow is pivotally connected thereto, all forming the improved buckle of the patent in suit. The claims are for an improved buckle comprising, 1, the pivoted bow, 2, the tongues, 3, the two diverging buttonhole loops for engagement with the buttons on the garment. Without here discussing the question whether or not in view of the prior art patentable invention is disclosed, we will turn to the defendant's structure, the alleged infringing device, and which is made in accordance with United States letters patent to one Charles W. Bartrum, dated March 6, 1906, application filed November 10, 1905, for "suspender loop."

The Bartrum patent has one claim as follows:

"What I claim is as a new article of manufacture, the herein-described suspender-loop, composed of a wire bent upon itself to form adjacent cells, having constricted entrances and a rigid connection, outwardly-bowed sides having inwardly bent portions above the cells, the ends of the wire being bent toward each other to form a cross-bar and such ends rigidly connected."

In the specifications the patentee says:

"The object of this invention is to provide a metallic loop for use, instead of a buttonhole-tab, on suspender-ends by means of which two adjacent buttons may be engaged without puckering the garment to which the buttons are attached or, in other words, so that the part of the garment on which the buttons are placed may be kept straight and flat while in engagement with the loop. The invention consists of a loop made of wire bent upon itself to form two button-engaging cells, which have constricted entrances, said cells connected and rigidly spaced apart by an integral cross-bar, the side limbs of the loop being bent inwardly toward each other and the ends of the wire brought together and secured to form a cross-bar above the inbent sides to be engaged by the suspender strap or webbing, the inbent sides preventing the accidental relative dislocation of the loop and suspender, all as I will now proceed more particularly to set forth and finally claim. The wire loop is adapted to engage the adjacent buttons, 10, placed upon any desired portion of a garment, as the band, 11, by slipping its cells, 1, under the button-heads and into engagement with the shanks, 12, of the buttons. When these shanks 12, are of greater diameter than the entrances, 2, to the cells, the sides, 4, yield after the manner of a spring, so as to permit the loop to be drawn up, and thereafter these sides spring back into place to prevent accidental disengagement of the cells from the buttons. The bar, 3, preserves the relative location of the two cells, and the said bar, the sides, 4, and the cells, 1, serve to keep the fabric between the buttons perfectly straight and flat, thereby overcoming the possibility of the garment buckling between these cells. Thus the garment is kept in good shape and well fitted about the person of the wearer. The loop is designed for use on aprons, overalls, trousers, and other garments held in place by suspenders or like devices. I am aware that prior to this invention there have been devised various forms of single and double loops of wire for use in

connection with various sorts of suspenders, and particularly that two-cell wire loops have been made a part of a buckle; but I am not aware that prior to this invention it has been proposed to constrict the entrances to the button-engaging cells, so as to prevent the accidental dislocation of the loop from the buttons, and, further, I am not aware that in such a double loop, adapted to be attached directly to the strap or webbing of a suspender, the sides have been bent in so as to prevent relative dislocation of the loop and suspender."

It seems clear to me that this patent recognizes the Corser patent, and that the two cell wire loops are old as part of a buckle. If so, there would be no invention in substantially duplicating a part of such buckle, viz., the two cell wire loops and naming it a "suspender loop." Clearly it is not invention to take part of a patented device and apply it to the same use, and give it a new name. The cells of the Bartrum patent are the buttonhole loops of the Corser buckle. But Bartrum claims to differentiate and improve, in that he constricts the entrances to the button-engaging cells, thereby preventing their dislocation or disengagement from the buttons, and, for the same purpose or to aid in accomplishing the same purpose, bends in the sides of the loop. To my mind it is perfectly clear that Bartrum discloses no patentable invention in thus constricting his loops, or cells, as he calls them, or in bending in the sides. This is an expedient that would occur to any mechanic skilled in the art, and which is clearly disclosed in the prior art and prior analogous arts, viz., stocking supporters and hooks and eyes or dress or ladies' garment fasteners, and trouser hangers and hangers for garments. Bartrum bends his loops or cells outwardly above the mouth thereof, or opening into it, and then inwardly, at the mouth of the loop or cell, thus constricting the opening, to the end that it shall not be easily disengaged from the button. In short, he would have some force applied to disengage the loop or cell from the button. But Corser has the same idea in his patent, although he does not form his loops or cells in precisely the same way. To prevent such disengagement of loops from the buttons, Corser says:

"The outer sides, 8, 8, of the buttonhole loops, are curved or bowed inwardly as shown. This guards against accidental disengagement of the buckle from the corresponding button, 2, 2,"—meaning the disengagement of the loops or cells of the buckle from the buttons.

Corser continues:

"Should a relative movement take place through any cause between the buckle and the buttons, such movement causing the buttons to occupy a position in the buckle higher up than the position which is represented in Fig. 1 [full engagement with the buttons at the bottom of the loops] then the inwardly curved or bowed sides, 8, 8, would press in under the buttons, 2, 2, and against the shanks thereof"—meaning that the inwardly curved sides of the loops would press in towards the shanks of the buttons between them and the garment to which attached, and that such pressure and inward curvature would tend to prevent the disengagement of the button from the loop.

He continues:

"This acts to prevent accidental disengagement of the buckle from either or both of the buttons with which it co-operates. In order to enable the buttons to be withdrawn from the buckle, it is necessary that the buttons should occupy a position in the buckle up near where the bow is pivoted to the body,

and after the buttons come to occupy such position it is necessary that they should be pressed towards each other in order to disengage them from the bowed sides, 8, 8."

That is, they must be pushed or pulled out of the loops or cells, and then pressed towards each other, for the reason that the inwardly bent or bowed sides of the loops so constrict the opening that the buttons will not come out until this is done. In short, for the same purpose, Corser constricts the openings into his loops or cells, but not in precisely the same way or to the same extent Bartrum does.

Turning to the prior art, we find the "trouser hanger" for suspending trousers in a wardrobe, patent to MacDonald of October 19, 1886, No. 351,058; "hanger for garments," for same purpose, patent to Hasse of June 21, 1892, No. 477,412; "combined sash and belt" for holding trousers on the body by means of a belt around the body of the wearer, patent to Zeltmacher of May 27, 1890, No. 428,793; "improvement in stocking supporters," for what its name implies, patent to Jenkins of March 19, 1878, No. 201,532; "hook and eye" for fastening garments, and it is common knowledge that they are used to suspend or hold up one garment fastened thereby to another, patent to Kimball of October 26, 1897, No. 592,296; "improvement in hooks and eyes," "a new and improved dress-fastening, which said fastening is also applicable to the fastening of belts and bands and to other like purposes," says the patent, United States patent to William Law, of Birmingham, England, of January 28, 1868, No. 73,817; "suspender attachment for trousers," patent to Slaughter, March 5, 1895, No. 535,227; "improved buttonhole and buckle," patent to Kettle of August 24, 1869, No. 94,002, for use with or as a part of suspenders for trousers and other garments; "suspender-buckle" patent to Jewett and Sargent of May 14, 1895, No. 539,133, and which says the patent "refers specially to a suspender buckle adapted particularly for use upon overall suspenders"; "improvements in brace or suspender end attachments," British patent to Walker & Glasgow of July 20, 1895, No. 18,449; "improvement in buckles with buttonhole attachment," patent to Greely of August 16, 1870, No. 106,356; and "combined button-holder and buckle," patent to B. G. Corser of October 25, 1887, No. 372,062. In the Law patent he says:

"I * * * have invented a new and improved dress fastening which said fastening is also applicable to the fastening of belts and bands, and to other like purposes."

This statement, in my judgment, is broad enough to make the invention applicable to suspenders for trousers and overalls, inasmuch as he further says:

"This form of hook and eye, made according to my improvements is exhibited * * * at figure 7 in connection with a brace buckle, the lower part of which, marked s and t, with the tongue, u, may be of wire planished down into this form or otherwise."

Figure 7 referred to shows a brace or suspender buckle with the double loop, as in the Corser patent in suit, with the sides bent inwardly, forming constricted openings into the two loops (or cells of the Bartrum patent), but such buckle is shown connected with a hook

to be attached to the garment to be held up, and which hook takes the place of the two buttons on a pair of overalls or trousers. If this Law patent is in an analogous art, and I think it is, then we have shown every essential feature of the patent in suit and of the Bartrum patent, for it would occur to any one with half an eye that he could use the buckle with the two loops or cells forming the buttonholes, as they are called in some of the patents, when attached to a pair of suspenders or braces, in connection with two buttons on the garment to be held up, as readily, easily, and as successfully as with "the hook" of the patent. The two buttons would be the equivalent of the "hook" and operate in the same way to connect the buckle having loops to the garment and would hold it up and in position. If attached to the straps or suspenders of a pair of overalls having a wide bib, two buttons on each side, each suspender or brace buckle having two loops, one for each button, it would engage therewith and hold up and keep the bib in position, and prevent it from earlopping. The suspender strap would be as near the neck of the wearer as comfortable, and would not pull off. In fact, it serves every purpose of the Corser device, operating in the same way to produce the same result.

The Slaughter patent does not show a buckle with two loops or cells to engage with the two buttons, but does show the equivalent of a buckle, and that this equivalent is connected with a curved bar, B, moving therein, so as to give freedom of movement, and which bar has tapering extremities turned upward and backward upon itself or rather towards itself, forming hooks or clamps, one at each end for engaging with the buttons on the garment to be held up and kept in place. Here we have a single brace or suspender for each shoulder which may be broad or narrow, a mere matter of selection, and two wire or metal loops attached thereto by means of the full equivalent of a buckle, and which two loops or cells or metal buttonholes, name them as we will, engage two buttons on each side the trousers or overalls placed at a distance apart. It is the idea of means and the idea of purpose to be accomplished set out in the Corser patent in suit. This Slaughter patent illustrates one of these devices on the end of the two braces joined at the back of the wearer, and connected with the button on each side of the trousers, but the patentee did not so confine its use, for he says:

"Secure like attachment to each end of suspenders in front, in like manner, securing curved bar, B, on either side of front waistband to its appropriate pair of buttons in the manner described above."

In the British patent to Walker and Glasgow, No. 18,449, we have substantially all that is embraced in either the Corser or the Bartrum patents. We have a buckle attached to the suspender. To this is attached what is called "a skeleton stretcher frame made up of four primary parts, viz., two wings or side members, whose outer ends have button loops with contracted and spring entrances, a U-shaped middle part and a suspension loop, whose lower parts are connected or coupled to the upper parts of the side members at their junction with the middle part, by clips, so as to admit of the middle parts and

the outer wings swinging laterally upon the suspension loop, which, when the attachment is in use, takes over a hoop, stud or equivalent, carried by a buckle frame or other attachment of a brace or suspender." In this structure or device the two wings or side members having the loops to attach or connect with the two buttons, one to each of the two buttons on a side, are not made of one piece of metal or wire as in the Corser patent in suit, but still they are there plainly shown and described, and the loops have the constricted mouths or openings to prevent disengagement from the buttons, and they diverge from each other, and are connected the one with the other and then attached to the buckle. I cannot see patentable invention in so bending a single piece of wire as to form this double loop with the constricted entrances or openings. It seems plain that any mechanic skilled in the art with the Walker and Glasgow patent before him would easily make the Corser device. It is clear that the Walker and Glasgow device can be attached to a shoulder strap or suspender for overalls or trousers of any width, and that with the two buttons on the garment and the two loops on the suspender every purpose of the Corser device is attained. It is quite true that the Corser device is more simple in construction and less expensive, but to my mind there is no new conception or thought aside from the mode of construction. It is also true that the two loop ends are kept apart to an extent by a coiled spring which encircles the bar forming the lower part of the U-shaped center, and thus enables the two loops to move towards each other, but which serves to keep them "constantly on the stretch," and thus prevent the sagging of that part of the garment between the two buttons. The patent says that this "attachment is preferably made from wire, strip metal, or the like." The second claim is:

"In braces or suspenders, employing as the means of connection with a garment, a duplex or double sided metallic stretcher frame, with button loops made integral therewith, substantially as set forth and described."

In the Jewett and Sargent patent, the Kettle patent, and the Greely patent, above referred to, we find suspender buckles with a single loop for engaging the button on the garment. In the Greely patent this is called "a metallic button hole," in the Kettle patent "a spring wire button hole," and in the Jewett and Sargent patent "the eye or loop." In each of these should we so bend the wire as to form two loops for engaging the buttons, instead of one, as shown, we would have the device of the Corser patent in suit. With these patents before him any mechanic skilled in the art would have no difficulty in constructing the two-looped buckle. Its necessity and utility and desirability in certain cases is plainly suggested in the prior art referred to.

Turning to the Hasse patent, "hanger for garments," the patentee says:

"This invention relates to new and useful improvements in hangers for garments; and the invention consists in the peculiar construction of a hanger designed especially for trousers or for an entire suit of gentlemen's clothes, whereby each garment may be supported in proper position without wrinkling and whereby each may be readily detached, all as more fully hereinafter described. * * * My hanger I preferably construct from a single piece of wire bent to form the central eye, A, preferably by making a number of cir-

cular bends therein, with the depending vertical portions, B, connecting this eye at each side with horizontal side extensions, C, which are of a length corresponding substantially with the width of the coat designed to be hung or the width of the trousers designed to be supported. At the end of this horizontal extension I bend the wire to form two V-shaped legs, D, and preferably form at the top of these legs a squared shoulder, E, extending upon both sides of the side extension, C. The eye, A, formed of a series of loops, as described, acts as a spring from which the entire device is suspended, and the horizontal portion, C, may be bent down more or less to cause the sections D to approach each other to a more or less extent to accommodate the device to articles of apparel of different width. In order to suspend trousers from the device, the buttons upon each side are engaged into the notches in the V-shaped legs, D, and drawn to the lower points thereof, these being of such a shape as to allow the shank or thread of the button to pass down to the apex of the opening, while the button may be firmly held in position, thus supporting the trousers on both sides and within the sides of the hanger, leaving the top perfectly free to receive the vest and coat."

These V-shaped legs or loops are made an essential element of the claims of the patent. The hanger entire is or may be made of a single piece of wire. The trousers hanger of MacDonald shows plainly the double loop for engaging with the buttons of the trousers. A person looking at the Hasse V-shaped legs with its square shoulder, E, and then at the Corser patent in suit and the Bartrum device will find in the first all the essentials of the last two so far as patentable invention is involved. In the stocking supporter of Jenkins, patent No. 201,532, we have the suspender to hold up the stocking with a loop which "comprises two adjacent cell-like bends * * * having the constricted entrances * * * and the rigid connecting-bar member" of the Bartrum patent. The sides are outwardly bowed, and then inwardly bowed to form the constricted entrances to the cells or loops. The only essential difference between Bartrum and Jenkins is in the mode of using. Bartrum engages his cells or loops with the buttons on trousers. He might have buttons on stockings, and in such case the mode of using would be the same. In place of buttons on the stocking Jenkins has another device or loop which first engages the "metallic fastening-loop having two inclined sides and two eyes or loops," which is substantially a duplication of the Bartrum loop and also of the Corser loop, and then engages the stocking. I cannot see invention in taking this Jenkins "metallic fastening-loop having two inclined sides and two eyes or loops," and, leaving off the spring clamp, attaching it to the shoulder strap of a pair of overalls and then engaging the "two eyes or loops," with buttons on the overalls. This is substantially all that either Corser or Bartrum has done.

If hooks and eyes may be regarded as in an analogous art, we have in figure 3 of the Kimball patent, No. 592,296, a device, made of a single piece of wire, which is in every essential a duplication of the Bartrum loop and of the Corser device in question. Made of suitable size it may be attached to the shoulder strap of overalls, to a suspender for trousers, or in any place where it is desirable to attach one garment to another, or to suspend a garment. Substitute buttons on the garment to be held up or suspended for the hooks of the patent, and we do the work of the Corser patent in the same way, by the same means. Kimball says:

"My invention relates to hooks and eyes such as are generally employed for fastening garments; and its object is to provide an improved construction of the same which shall be simple and inexpensive to manufacture and in which there will be no liability of the hook being accidentally disengaged from the eye. * * * The manner of using the invention is as follows: The hook and eye are secured to a garment by means of the pins, 6 and 14, and to connect them together the lug or hook, 4, is passed between the arms, 12, of the eye, as seen in Fig. 4. By now pulling the hook, 1, outward, the bends of the lug or hook, 4, will engage, respectively, with the eyes or loops, 9, as seen in Fig. 1. The bends, 11, will now serve as stops for the lug or hook, 4, preventing the latter from being accidentally disengaged from the said eyes or loops. By this means there is no liability of the hook and eye being accidentally disengaged or disconnected from each other."

Substitute buttons for hooks in these extracts, and we have covered the whole subject.

Turning now to the file wrapper of the Corser patent in suit, we find that he had three claims, all of which were rejected on the Law and Slaughter patents above referred to as shown by the communication of E. B. Moore, acting Examiner Division 35, January 7, 1899. This communication shows that the Patent Office regards hooks and eyes as an analogous art. On this rejection the applicant amended his specifications in describing his buckle with the two buttonhole loops by inserting, "and which flare or diverge somewhat relative to each other in order to hold the buttons which they engage the proper distance apart, thereby preventing the material of the bib between the loops, 5, 5, from puckering and keeping it smooth at all times." The claims were amended by inserting the word "diverging" before the words, "buttonhole loops." Claims 1 and 2 were then allowed, but the rejection of claim 3 was persisted in. It follows that these claims must be narrowly construed in any event. The patent is limited to the construction which has two "diverging" buttonhole loops. He is not entitled to any range of equivalents in this regard. He has accepted the limitation on his claims.

The Bartrum device, the alleged infringing device, does not have "diverging" buttonhole loops. The two loops are perpendicular to each other. Therefore the defendant's device made in accordance with the Bartrum patent does not infringe. Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399–414, 25 Sup. Ct. 697, 49 L. Ed. 1100; Computing Scale Co. of America v. Automatic Scale Co., 204 U. S. 609, 27 Sup. Ct. 307, 51 L. Ed. 645; Kokomo F. M. Co. v. Kitselman, 189 U. S. 8, 23 Sup. Ct. 521, 47 L. Ed. 689. In Universal Brush Company v. Sonn (C. C.) 146 Fed. 517, this court undertook to protect a patentee in what it regarded as a meritorious invention. In his specifications and claim he had described his opening into the chamber of the brush frame as "a contracted aperture." The defendant's brush frame did not have "a contracted aperture," but had a raised portion in the chamber which contracted the chamber and furnished an additional adhesive surface for the plastic composition, and thus did away with the necessity for the "contracted aperture" into the chamber. This court gave a very wide meaning to "contracted aperture," and also gave complainant the benefit of the doctrine of equivalents. The Circuit Court of Appeals reversed, holding that the patentee had by express words confined himself to "a contracted aper-

ture," and that, as his patent belonged to an old and a crowded art, he was not entitled to any range of equivalents. Universal Brush Co. v. Sonn et al. (C. C. A.) 154 Fed. 665, 668, 669. The Corser patent in suit belongs to an old and crowded art, as we have seen, and infringement cannot be predicated on the use of the two-loop buckle, unless the two loops diverge the one from the other. But I am satisfied on an examination of the prior art, and in view thereof, that the Corser patent in suit is void for want of patentable invention in view of that art, and that, had the attention of the Patent Office been directed to the patents to Jenkins, No. 201,532, to Walker and Glasgow, No. 18,449, to Hasse, No. 477,412, and to Kimball, No. 592,296, in each of which the loops diverge as in the Corser device and patent as is plainly shown in the drawings and in Kimball mentioned as follows: "The numeral 8 designates the eye, made from a single piece of wire bent over at the center, forming an inwardly extending tongue or lug, 9, and two oppositely-extending eyes or loops, 10, inclined at an angle with respect to each other" the patent would not have been granted. The V-shaped legs, D, of Hasse, are not described as diverging from each other, but are so shown in the drawings to which reference is made. In Walker and Glasgow the drawings show the two loops diverging, and they are described as "two wings or side members whose outer ends have button loops," plainly indicating that each has an inner and an outer end, and that consequently the one diverges from the other. In Jenkins he speaks of the lower part of the inclined side of the metallic fastening loop, B, and also of the other inclined side of such loop. True, he does not say that they are so inclined as to diverge, but as the specifications refer to the drawings, and must be read with them, and, as the two loops do diverge, the prior art plainly shows and teaches the two diverging buttonhole loops located adjacent to each other.

Mr. Finckel, defendants' expert, says that:

"I do not find in the exhibits defendants' buckle and defendants' overalls in question the structure defined in the claims of the patent in suit, first, because defendants' bib-engaging loop is no part of a buckle, and does not contain a pivoted bow, nor the tongues that go to make up part of a buckle, nor are the button engaging loops divergent; and these are the elements that enter into claim 1 of the patent in suit; nor do I find these elements used in connection with inwardly bowed sides which constitute the elements claimed in claim 2 of the patent in suit."

Complainant insists that the two loops of defendants' device do diverge, and that this is shown by a diagram contained in his brief, which indicates or shows that, to release the two buttons from the two loops of the defendants' device, it is necessary to draw them towards each other as they reach the constricted mouth or opening. It must be conceded that such is the fact, but to my mind this does not show that the two loops diverge. The centers of the openings are nearer together than the centers of the loops, and nearer together than the centers of the bottom parts of the loops, but this is occasioned by the drawing or curving inwardly of the outer sides of the loops at the mouth so as to constrict the mouths. The loops as a whole, as loops, are perpendicular to each other, and do not diverge. Figures

1 and 2 of the Corser patent in suit show that the loops do not stand perpendicular to each other. They show an inward curvature of the outer side of each loop, but there is a corresponding curvature of the inner side of each loop. In short, the bottoms of the loops point diagonally away from each other, and so diverge. I hold (1) that the Corser patent in suit is void for want of patentable invention in view of the prior art; and (2) assuming it to be valid and giving it the broadest construction to which entitled, in view of the proceedings in the Patent Office, the defendants' device does not infringe. There will be a decree dismissing the bill, with costs.