## CHESTER–POLLARD AMUSEMENT CO., Inc., v. POPULAR GAMES, Inc., et al.

Circuit Court of Appeals, Eighth Circuit.
August 29, 1929.

No. 8569.

Clifford E. Dunn and Holland S. Duell, both of New York City (J. E. Daniels, of New York City, H. Z. Mendow, of Minneapolis, Minn., and Duell, Dunn & Anderson, of New York City, on the brief), for appellant.

A. C. Paul, of Minneapolis, Minn. (Richard Paul, Maurice M. Moore, and F. C. Caswell, all of Minneapolis, Minn., on the brief), for appellees.

Before STONE, BOOTH, and GARDNER, Circuit Judges.

GARDNER, Circuit Judge. In this action appellant, who was plaintiff in the lower court, brought suit in equity against the defendants, alleging ownership of certain patents by assignment, which will later be referred to, and that through its ownership of said inventions and letters patent it had made practical use of said inventions, and had expended large sums of money and devoted much time and effort to the commercial exploitation thereof, and had successfully established a large and increasing business in what is described and referred to in the bill of complaint as its "Golf Games," which will be later noticed and described; that there was an increase in public demand for said patented "Golf Games" in preference to all others, and that, but for the alleged infringement by the defendants, the plaintiff would enjoy a substantial monopoly of the market, to which it was entitled by reason of letters patent and of the time, money, and effort which it had expended in the commercial exploitation thereof; that the defendants, without the consent of the plaintiff and against its will, infringed upon said letters patent, since the issuance thereof and before the commencement of this suit, within the district of Minnesota and elsewhere in the United States, by unlawfully and wrongfully making, using, and selling to others to be used golf games embodying the inventions described and claimed in said letters patent, and that the defendants were preparing and had threatened to continue such infringement, and the manufacture and sale to plaintiff's customers and others, at prices below the reasonable price asked by plaintiff for its patented product.

Plaintiff then asked for a perpetual injunction against the defendants from infringing plaintiff's United States letters patent Nos. 1,012,820, 1,391,306, and 1,573,415, and from making or causing to be made, using or causing to be used, or selling or causing to be sold, any golf game or other article containing or embodying the inventions of said letters patent, and from making any use whatever of the characteristic appearance or construction of the cabinet and football man of plaintiff's football game. An accounting was also asked for alleged unfair competition, and that the defendants be required to pay back to plaintiff all the advantages and profits realized by or accruing to defendants by reason of their infringements, and the damages and losses inflicted on plaintiff by reason of defendants' infringement and unfair competition.

410

The answer specifically responds to the allegations in the bill of complaint with reference to the three letters patent described, specifically denies that the plaintiff had made practical use of the pretended inventions and claimed by the plaintiff, or that it had expended large sums or devoted much time and effort to the commercial exploitation thereof, and generally put in issue, either by denial or by confession and avoidance, all the material allegations of the complaint, except such as are specifically admitted.

On trial of the suit the court dismissed the bill of complaint for want of equity, no findings were requested by either party, and none were made or entered, but the grounds of the lower court's decision are set out in the memorandum opinion embodied in the record. The decree of dismissal is challenged on appeal to this court as not being sustained or warranted by the evidence. No question is raised as to the validity of the patents directly involved, but the issue arises on the allegation of infringement.

It is claimed that the defendants' device is an infringement of three patents owned by the plaintiff and known in the record as the Cory patent, the Eliaser patent, and the Mendes & Lanners patent. The defendants' device is generally described in the record as comprising a cabinet with a glass front and instrument board immediately below the same. Within the cabinet and visible through its glass front is a golf field, which is in the nature of a casting representing a miniature golf course. Upon the instrument board are situated two control levers and a coin control mechanism, having a coin slot for the insertion of coins of proper denomination. Upon the field is arranged three greens, which are formed with holes passing completely through the field. At one end of the field is situated a manikin, which is mounted upon a rotatable platform. This manikin is controlled through two levers in such manner that by pressing one lever the platform may be rotated to cause the manikin to operate a swinging club in such a manner as to project the ball toward any of the three greens. One of these levers is connected, by suitable mechanism within the case, so as to operate the club held by the manikin for the purpose of propelling the ball. In the operation of the device the application of pressure upon this last-named lever causes the club to be moved from the position in which it is held by the manikin toward a tee, which is indicated by a small circle on the plate. In the end of the field remote from the manikin is formed a depression in the field simulating a lake. This lake has an opening in the same, which passes completely through the field. At the lowermost portion of the case is a removable board, which is hingedly connected to the case, and it is provided with a lock by means of which the same may be opened. When this board is opened, access may be had to the interior mechanism of the case and the money received in the machine may be removed. At the top of the case is situated a board, on which may be placed posters or other placards.

The operation of the device may be described as follows: In the normal condition after the machine has been operated and a player has left it, all of the balls roll into a cage, and so remain until another coin is deposited in the coin mechanism. Whenever a ball goes through one of the holes in the green, it goes into this cage, and if the ball does not go into a hole in the green it has two courses; it may go into the lake, and enter the hole in the bottom of the lake and roll back to the pocket, or it may be returned automatically to the tee on the table. If it does not go into one of the holes in the green, or in the lake, it runs back to the tee. The ball is not supposed ever to come to rest on the surface of the green or the connecting part, and it is not desired to have the ball come to rest, except in the cage and in the pocket and on the tee—not upon the playing surface. Having deposited a coin, the coin device throws the three balls from the cage into a trough leading to the pocket. The operator or player may then press a button, which releases the lower ball in the pocket, and this ball will then roll upon the field proper, and finally come to rest at the tee on the platform. The player then manipulates the two levers, gauging the direction of his shot by one lever, and the strength or degree of play by the other, propels the ball toward any of the three holes. If he is successful in propelling the ball into any of the three holes, the ball passes through the field and comes to rest in the cage. If he is not successful, the ball rolls back to the tee and the operator repropels the ball. Then he continues to play until the ball is finally sunk or holed. When one ball has been sunk, the player then presses the button and receives another ball, and drives it into one of the other holes. As soon as the first ball is ejected from the pocket, the two remaining balls roll down toward the end or pocket, which is slightly sloping, toward an injecting mechanism for removing the same therefrom. The player then continues playing the second ball until that ball has been sunk. Then he again

presses the button and receives the third ball, and when it is finally sunk the game is ended, and the player determines his score by the number of strokes used in sinking the balls into the various holes. If a ball at any time goes into the depression called the lake, it rolls back in the pocket 45, where it may again be released and be played over.

Any ball that passes through any of the holes in the green goes into the cage, and can only again be used by an insertion of another coin, and every time a ball is knocked over the field it returns to the player, unless it goes into one of the holes or goes into the lake. After a ball goes into the lake, it reaches a pocket device and can be played again, and when the three balls, or whatever number may be used, have passed in through any holes except the one in the lake, the device is inoperative until another coin is inserted.

The Cory patent owned by the plaintiff by assignment is not a miniature game at all, but a device for an active indoor game of golf. Reference to the specification shows that it is used for golf practice. The general nature or object of the invention is thus stated by the patentee: "My invention relates to a game apparatus by which a game of golf can be played indoors. The object of the invention is to provide means by which such a game can be played, the usual clubs and balls being used, and much recreation and valuable practice in the handling of such clubs obtained." That defendants' device does not infringe the Cory patent seems too clear for argument. Anakin Lock Works v. Dillon Lock Works (C. C. A.) 292 F. 45; Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 25, 23 S. Ct. 521, 47 L. Ed. 689; Automatic Appliance Co. v. McNiece Motor Co. (C. C. A.) 20 F.(2d) 578. In fact, on oral argument, counsel for plaintiff waived all claim based upon an alleged infringement of the Cory patent.

The device of the Eliaser patent is in the same class as defendants, and it is the claim of the defendants that a number of other devices occupied this same field before the patenting of the Eliaser device. The specifications set out the general nature and object of this device as follows: "My invention relates to a game and means for playing the same. An object of the invention is to provide a game in which the elements of skill, chance, and action are blended into an amusing and attractive whole. Another object is the presence of a mechanical figure, through the manipulation of which the game is played." The apparatus is described in the specifications as follows:

"My game consists of a board 2 suitably laid out to simulate a golf course, in which the cup 3 lies in the green 4, and is surrounded by bunkers or traps and hazards 7 placed in any desired manner. A fairway 8 extends the length of the board. Three sides of the board are provided with a wall of suitable height, and at the unwalled end is a plate 1 in frictional contact with and joined to the board by a screw 11, the square head of which provides a tee for the ball 12. A mechanical figure for striking the ball and comprising the body of the frame 13 is fixed on the plate. Any suitable rules may be devised for playing the game, such as the allowance of 18 shots or strokes for each player, values being assigned to the different areas or portions of the course. The value of any stroke is that of the spot on which the ball comes to rest. Preferably the values 14 are placed on the course in connection with each feature thereof. After each player has made 18 strokes, that player scoring the least number wins. Thus a ball landing in the course scores 1 for the player, or if it comes to rest in the fairway he scores 3. The flight of the ball may carry it directly to its scoring place, or it may first strike the wall 9 and rebound."

This device has a mechanical figure, referred to generally as a manikin. This figure is provided with a clock spring, which can be wound up, and when the spring is released the golf club held by the manikin strikes a ball placed on the tee. The figure is mounted on a pivotal plate or platform at the end of the green board. The surface of the board or field is level, one portion being designated as a fairway and another as a green, provided with a hole or cup. Bunkers and hazards are provided on the surface of the board, and the different areas of the board have arbitrarily assigned values, designated as evaluated areas.

There are some marked differences to be noticed between this mechanism and that of the defendants. There are no holes through the green board in the Eliaser patent at any point, and a ball driven by the manikin will either drop into the cup or into a trough, or will come to rest at some point on the surface of the field, and the areas or portions of the field or board have assigned certain values. The surface of the field or board is level, and the ball is not automatically returned to the tee, but must be picked up from the position at which it comes to rest, and put by the player on the head of the screw

forming the tee. The method of operation is set out in the specification of the patent as follows:

"The operation of the mechanical figure is as follows: The ball is placed upon the tee and the figure turned on its pivotable mounting to determine the direction of the drive. The key is then turned, and the arms 26 and 27 being engaged, the shaft 18 is rotated, raising the club and tensioning the spring 28. The pawl 31 retains the key and shaft 18—22 in the position to which it is turned. When it is desired to make the shot, the key is pulled outwardly a short distance to disengage the arm 27, which frees the shaft 18 and permits the spring 28 to act, throwing the club around into contact with the ball which is thus driven from the tee. A stop 32 fixed on the body limits the subsequent throw of the club, but this may be dispensed with, and after momentary oscillation the club assumes the position shown. Completing the full rotation of the key then brings the arm 27 again into engagement with the arm 26."

Confessedly there are some striking similarities between this device and that of defendants, and it is the claim of defendants that consideration must be given to the field occupied by these devices and to the priority in this field. It appears from the record that at least three prior patents had been granted for devices containing many of the features of the device of plaintiff and that of the defendants. They are referred to in the record as the Matthewson patent, the Bickle patent, Shaw patent, Jacobs patent, Valie patent, besides a number of others. These prior art patents are important, as bearing upon the rule applicable to the alleged infringement in the case at bar. It need only be said with reference to these other patents that they are such as to occupy in a general way the same field, and hence the claims based upon the subsequent patents must be narrowed down to the specific claims made in the specifications. The present devices under consideration are constructionable elements, and hence, to constitute an infringement, every element, material, and part mentioned in the claim, or its equivalent, must be used in the same relation to constitute infringement, and it is immaterial that one or more of the elements specified in the claim are not of the essence of the invention, as every element claimed must be regarded as material.

In the article on "Patents," 20 R. C. L. at page 1157, the author states the rule as follows: "A combination is always an entirety. The patentee cannot abandon a part and claim the rest, nor can he be permitted to prove that a part is useless, and therefore immaterial. He must stand by his claim as he has made it. If more or less than the whole of his ingredients are used by another, such party is not liable as an infringer, because he has not used the invention or discovery patented. With the change of the elements the identity of the product disappears. If, for example, a patent for a combination consists of three parts, the use of any two of these parts only, or of two combined with a third, which is substantially different in form, or in the manner of its arrangement and connection with the others, is not an infringement." See, also, Anakin Lock Works v. Dillon Lock Works (C. C. A.) 292 F. 45; Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 23 S. Ct. 521, 47 L. Ed. 689; Miller v. Monarch Printing Co. (C. C. A.) 285 F. 364; Royal Co. v. Tweedie (C. C. A.) 276 F. 351; Keystone Bridge Co. v. Phoenix Iron Co., 95 U. S. 274, 24 L. Ed. 344; McClain v. Ortmayer, 141 U. S. 419, 12 S. Ct. 76, 35 L. Ed. 800; Brake-Beam Case (C. C. A.) 106 F. 693, 718; Automatic Appliance Co. v. McNiece Motor Co. (C. C. A.) 20 F. (2d) 578; Lakewood Engineering Co. v. Stein (C. C. A.) 8 F.(2d) 713; Gruendler Mfg. Co. v. Hussman Co. (C. C. A.) 16 F. (2d) 571.

In the Eliaser device one of the essential elements is a board having evaluated areas thereon. As patented, the Eliaser device and that of the defendants are combination claims. It follows that, if a single element or combination of each claim is omitted, then defendants' structure is not an infringement. As said by this court in the Brake-Beam Case, supra: "The absence from a device that is alleged to infringe a patented combination of a single element of that combination is fatal to the claim of infringement."

The defendants' device does not have the "board having evaluated areas." The game under the Eliaser patent contemplates that the ball shall come to rest, and the value of the stroke or play is to be measured by the place at which the ball comes to rest; while the defendants' device is so constructed that the ball can never come to rest at any point on the surface of the field. If it does not pass through one of the holes or into the lake, it must roll back and come to rest on the tee at which the manikin is mounted. The specification in the Eliaser patent specifically provides that "the value of any stroke is that of the spot on which the ball comes to rest," and hence there is no basis for the argument advanced by counsel for plaintiff that the claims are silent as to the ball coming to rest.

The claim that defendants' device is an infringement upon the Eliaser patent is therefore not sustained.

There remains to be considered the claim that the defendants' device is an infringement upon the Mendes & Lanners patent. What has been said with reference to the Eliaser patent being a combination of old elements is equally applicable to the Mendes & Lanners patent. This patent describes an inclined field with a pocket at its lower end, into which the golf ball may roll, and from which it can be driven by a stroke of the club held by the manikin. The manikin is mounted for pivot rotation, at the end of the field near the recess forming the receptacle into which the ball rolls as it travels down the inclined field. The manikin is provided with a golf club, which through the manipulation of the mechanism strikes the ball. The device may be operated by means of a stem being handled as shown in the illustration, connected to the club and in position to be grasped by the player. By grasping this handle a person can turn the stem in such a way as to swing the club over the depression indicated on the figure. The ball is driven up over the inclined field. A series of holes extending through the field are located near its upper end. In the model used on oral argument there were two of such holes. The ball, when struck and driven onto the field, may enter one of these holes; but, if it does not enter the hole, it will roll back over the inclined surface of the field into the depression. If it does enter one of the holes, it does not pass through, but comes to rest upon a plate arranged beneath the surface of the hole, leaving the ball projecting above the surface of the field. This supporting device is called the release, and is arranged above a lever to which it is connected by a pivot arranged at one end of the member. The other end of the member rests upon the lever, so that the lever in this manner holds the surface of the member substantially parallel with the under surface of the field. The purpose of the player is to get all the balls into the holes where they will rest upon the release plate, and there remain projecting above the surface of the field. When these holes have all been filled with the balls, the lever may be manipulated so as to raise the suspending plate up against the bottom of the field, thus pushing the balls out onto the surface of the field, when they will roll down to the lower end of the field. All of the balls are then removed by the player except one, and he plays with this one until he has succeeded in placing it in one of the holes. The play, of course, can continue until the holes are all again filled with balls.

Now the defendants' device does not have the suspending release plate of the Mendes & Lanners patent, which is a plate arranged beneath the holes in the field, and which serves to raise the balls to the surface of the field, so that they may return to the player over the inclined field. Neither does the defendants' device have any equivalent for this claim. The defendants' device has nothing to retain the ball when it enters a hole in the field. The Mendes patent is therefore not infringed by the defendants' device. As said by the lower court, "identity of means and of operation are both lacking." It is to be noted that the coin control element, constituting an important feature of defendants' device, is not found in any of the devices of plaintiff, nor is any equivalent to this element found in any of plaintiff's devices.

It is charged in the bill of complaint that the defendants had been guilty of unfair competition. The lower court, after hearing all the testimony, found against this contention, and this finding is amply sustained by the evidence. No effort was made to deceive the public into believing that the defendants' device was a product of the plaintiff; certainly their device did not resemble the general appearance of the devices of the Cory, Eliaser, or Mendes and Lanners patents, and under which the plaintiff is asserting the right to maintain this suit. In fact, it is quite apparent that the chief use which the plaintiff has made of these three patents is as a basis for maintaining this action. The product which plaintiff in fact manufactures and seeks to produce commercially is its "Golf Game," which is not in issue, and which confessedly was produced and patented subsequent to the device of the defendants.

The judgment of the trial court is affirmed.