## WEIL PUMP CO. v. CHICAGO PUMP CO.
### No. 5070.

Circuit Court of Appeals, Seventh Circuit.
Nov. 28, 1934.

Joseph Harris and Merville K. Hobbs, both of Chicago, Ill., for appellant.

Charles O. Shervey and Fred Gerlach, both of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

SPARKS, Circuit Judge.

This is a patent infringement suit, involving claims 1, 2, 4, and 9[1] of Patent No.

[1] 1. A duplex pumping apparatus the combination of a receptacle and a pair of automatically controlled, alternately operating, motor driven pumps for ejecting liquids from said receptacle, the control means for said pumps being governed by the rise and fall of liquid in said receptacle.

2. In duplex pumping apparatus, the combination of a receptacle and a pair of automatically controlled, alternately operating, motor driven pumps for ejecting liq-

1,666,873. The patent, which covers a duplex pumping apparatus, was issued April 17, 1928, to A. C. Durdin, Jr., on an application filed by him April 27, 1927.

The defenses are invalidity and non-infringement. The alleged invalidity is based on (1) prior art, (2) non-compliance with R. S. § 4888 (35 USCA § 33), and (3) the fact that the claims are for mere functions.

The apparatus comprises a cistern or well which receives liquid through an inlet; two electric motors; two centrifugal pumps, each connected so as to be driven by one of the motors and connected to discharge the liquid through pipes respectively, to empty the cistern; separate switches for controlling the electric circuits for the respective motors; separate floats on separate two-section rods for shifting the separate switches to start the separate motors when the liquid rises sufficiently to necessitate the operation of one pump, and stop them when the cistern has been emptied; and a device associated with each two-part float-rod between the upper and lower sections thereof. This device is designed to automatically and alternately render the first float-rod section operative to start and stop one pump for one pumping cycle while the other upper float-rod section in ineffective to shift its associated switch and will keep the second motor and pump idle during that cycle. At the next filling of the cistern it renders the other float-rod effective to shift its switch and cause its motor and pump during that cycle to operate, thus governing, by the successive rises of the liquid in the cistern, the motors and pumps to automatically alternate in their pumping cycles.

The automatic device, between the upper and lower sections of the float-rods, constitutes what is termed a "lost motion" device, or "length changer," and causes the successive alternating uses of the separate motors. The device comprises a slotted cylinder attached to the lower rod section, and a pin attached to the upper rod section which works up and down in an irregular slot of the cylinder. When the lower rod section first rises while its pin is engaging a long slot in the cylinder, it will move upwardly relative to the upper section of that rod a distance corresponding to the length of the long slot, and this constitutes the "lost motion" because the movement of the lower part of the rod cannot affect the upper part of the rod until the pin comes in contact with the bottom of that slot. The length of that rod in its effective use is thereby shortened, by the length of the slot, more than that rod would be if it were rigid. During this action the second float rod having no such lost motion device in it, will rise in advance of the upper rod section of the other float rod, and hence start its motor by closing its switch. On the next action the pin of the first float rod will traverse a short slot in its cylinder and the amount of lost motion will be correspondingly less so that the upper rod section of that float rod will be quickly elevated and actuate its corresponding switch lever in advance of the non-extensible float rod. If the liquid continues to rise sufficiently in the receptacle, the later acting float rod will be elevated sufficiently to then cut in the second and previously idle pump, thus providing for simultaneous operation of both pumps for emergency overloads.

The combination of duplex or twin electric motor operated pumps in a receptacle wherein pumps are automatically started and stopped by float-operated rods or cables, combined with the cumulative or simultaneous operation feature, was old in the art. Yeomans 735,430; Kinney 1,003,757; Thomas 1,059,409; Lewis 1,357,102; Durdin prior patent 1,488,237. Many others of the prior art were cited by appellant but they were not discussed or mentioned in its brief, except Lindemann, 1,666,498 which clearly

uids from said receptacle, the control means for said pumps being governed by the rise of liquids to a predetermined level to start the pumps alternately, and being governed by a rise of the liquids above said predetermined level to start both pumps.

4. In duplex pumping apparatus, the combination of a receptacle, a pair of alternately operating, electric motor driven pumps for ejecting liquids from said receptacle, and starting and stopping mechanism for each pump motor, controlled by the level of the liquids in the receptacle, said starting and stopping mechanisms operating to start the motors in alternate sequence at succeeding predetermined high water levels in the receptacle and to start an idle pump motor at a predetermined higher water level in the receptacle.

9. In duplex pumping apparatus, the combination of a liquid receiving receptacle and a pair of automatically controlled, alternately operating, motor driven pumps operating to pump the liquid entering said receptacle, and motor controlling means for starting and stopping said pumps alternately, said motor controlling means being governed by the rise and fall of liquid in said receptacle.

anticipates if it in fact antedates the patent in suit. It is obvious that the other prior art patents cited do not anticipate the patent in suit for the reason that none of them comprise the automatic alternating feature.

█ The Lindemann patent and the patent in suit were issued on the same date, but Lindemann's application was filed on April 9, 1926, antedating Durdin's application by a little more than a year. With respect to this situation, however, the court made the following finding:

"The evidence establishes that Augustus C. Durdin, Jr., the applicant for the patent in suit, conceived the duplex pumping system with a device for automatically controlling the alternate operation of the pumps, prior to June, 1925; that Durdin disclosed it to Lindemann, the applicant for patent No. 1,666,498 in June, 1925; that said Durdin and Lindemann were at the time co-employees of plaintiff for whose benefit the inventions were being developed and reduced to practice; that Lindemann, in his application for his patent, made no claim for generic invention disclosed to him by Durdin, and limited his claims to a species of alternating device of the pawl-and-ratchet type developed by Lindemann as part of his work for plaintiff; and that Lindemann was not the original inventor of the invention specified in the claims of the Durdin patent in suit."

A perusal of the record relating to this phase of the transaction convinces us that the finding is correct. There was never any controversy between the patentees with respect to the claims or objects of their patents. It was not a matter of great interest to either of them, for under the evidence they were both bound to, and did, assign their applications to their employer. That Lindemann's application was filed first might easily have been due to the fact that his employment was of lesser rank than Durdin's and for that reason might terminate sooner. Under 35 USCA § 35, an application for a patent must be made by the original and first inventor, and from common experience it is known that applications by an employee for his inventions are more readily procured during the term of his employment.

The defense of non-compliance with the statute refers particularly to that part of section 4888, Rev. St. (35 USCA § 33), which provides that the application for a patent shall contain a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to make, construct, and use the same.

Appellant contends that the patent in suit does not comply with those requirements in that the slot in which the pin travels is a continuous slot around the surface of the cylinder, and necessitates (1) a rotation of the lower rod section with reference to the upper rod section, and (2) that such rotation must always be in the same direction. This is illustrated by Figures 2 and 3 of the patent, and also by Figure 7 of Durdin's patent 1,732,577, which is a diagrammatic view of the slot on the cylinder, laid out flat. They are here set forth:

The entire circumference of the cylinder contains two long slots, which are opposite each other, and two short ones which are oppositely placed. Being interconnected, the four slots in fact form one irregular slot which extends completely around the cylinder, thus joining the fourth slot with the

first. For convenience, however, we refer to the long and short slots, which are respectively represented by numbers 32 and 33 in Figures 2 and 3. In the same illustrations 24a and 29a represent the upper part of the float rod, and 24b and 29b represent the lower part of the float rod, the upper and lower parts being connected by the "lost motion" device 29. Figure 7, which is a flattened view of the entire circumference of the cylinder shows two long slots 20, and one short one 28, the other short one 19 appearing in its completed condition when the figure assumes its proper cylindrical form.

■ It will be noticed in Figure 7, that leaf springs 32, which serve as gates or latches, are placed at intervals in the slots to prevent reverse rotation, and to impel rotation in the other direction. These, appellant, insists, are necessary for the proper function of the patent, and are not mentioned in either the claims or specifications of the patent in suit. Hence, it argues that without a reference to Durdin's later patent 1,732,-577, the patent in suit does not sufficiently disclose the control means to start the motors in alternative sequence as required under section 4888. It will be observed, however, that the leaf springs do appear in Figures 2 and 3 of the patent in suit, although they are not referred to in the specifications and are not specifically described in the claims. While it is true that the commercial article contains the springs, the record discloses that the patent successfully operates without the presence of the springs, and this was demonstrated at the oral argument. These facts, together with the presumption of validity which rises from the issuance of the patent, necessitate a holding in favor of the validity of the claims.

■ It is next contended by appellant that the claims in suit are for mere functions, and for that reason they are invalid. The patent, however, comprises a combination, and even though the elements are old, if the result produced by such combined use is new, or if it be an old result produced in a more facile and efficient way than theretofore, the patent is valid. We are convinced that the result produced by the patented device meets the requirements of this rule, and we think the claims in suit are valid.

The remaining question is that of infringement. Appellant uses the duplex automatically operated pump system of the prior use type. For the old hand operated reversing or alternating switch it substitutes an automatic alternating or reversing switch

of the old commercial type, and thus effects automatic operation and automatic alternation of the motors without the necessity of a second float rod or second float controlled switch. In the commercial installation of appellant's device a second float and float rod are used to produce cumulative or simultaneous operation of the motors in the event of an emergency, but they contribute nothing whatever to the alternating operations of the motors. The alternating or reversing switch is located on an electric panel board remote from the pumps, as was done with the prior use apparatus. The float rods are used by appellant for actuating the pilot control switches by buttons or collars, and they effect the starting and stopping of the motors and their simultaneous operation as in the patent in suit and in the prior patents of Yeomans, Kinney, Thomas and Durdin 1,488,237. However, instead of employing independent electric circuits for the two motors, as in the patents last mentioned as well as the patent in suit, appellant uses interconnected electric circuits with a transfer or alternating switch. It makes no change in its float rods, or the buttons or collars thereon, or the pilot or float control switches operated thereby, or the mode or means of automatically starting and stopping the motor by the rise and fall of the liquid. The automatic alternation of the motors is not caused by any lost motion device in the float rods, but by electrically reversing or alternating the switch.

■ Appellee's "lost motion" device in the float rod is directly operated by the rise and fall of the liquid. Appellant's reversing switch is actuated by electric current in the motor circuits, although the rise and fall of the liquid indirectly causes the current to start and stop. Appellee's "length changer" is incorporated in a float rod and built into the pump apparatus at the factory. Appellant's reversing switch is located remote from the pumping apparatus and is installed independently of the installation of the pump apparatus. The "length changer" of the patent is actuated prior to the starting of any motor or pump, while appellant's reversing switch is actuated by shutting off the current after the pump ceases operation. The patent requires two float rods to produce alternation, and they must be of different effective lengths, while appellant's device produces alternation with but one float rod which in length is always constant. In the patent, the motor circuits are independent and the float rods are inter-dependent, while in appellant's device, the motor

circuits are inter-connected and the float rods are independent. It is clear that there would be no infringement on the invention if appellant used every element which his device now discloses, except the automatic reversal of the switch, because every element is old in the art, and their combination produces no new result, nor any old result in a more facile or more efficient manner. Both the patent and appellant's device accomplish precisely the same result but by radically different means, methods, operation, and mechanical construction. To constitute infringement there must be a concurrence of means and operation as well as result. Kokomo Fence Machine Company v. Kitselman, 189 U. S. 8, 23 S. Ct. 521, 47 L. Ed. 689.·

It is urged by appellee, however, that its patent is a "pioneer" patent, hence entitled to a wide range of equivalents. With this construction we cannot agree. Durdin's only contribution was the substitution of an automatic length changer of the float rods for the manual length changer of his earlier patent, and it is obvious that the patent is purely one of improvement and not in any sense a pioneer. Northwest Engineering Corporation v. Keystone Driller Company (C. C. A.) 70 F.(2d) 13. It is true that the claims of the patent are rather broad, but a patentee's broadest claim can be no broader than his actual invention. In Burroughs Adding Machine Company v. Felt & Tarrant Manufacturing Company, 243 F. 861, 870, this court said: "When a patentee has fully and clearly described his actual invention in the specification and drawings of his patent, and has fully covered that invention by the broadest claim to monopoly which the law will allow him, he cannot then, by merely including in his patent a more broadly or more vaguely stated claim, cover and monopolize something more than and different from his real invention." See also State Bank of Chicago v. Hillman's (C. C. A.) 180 F. 732.

Patentee discloses one specific mechanical means and mode of operation for obtaining the result of automatic alternately operated motors, and we construe the claims to mean that such automatic alternate operation is directly caused and governed by the rise and fall of the liquid. To interpret the claims in such manner as to include any and all other means and methods by which the same result is obtained would be expanding his claims more than their language, and appellee's originally expressed intention, would warrant. In appellee's circular advertising the alternator of Durdin prior patent 1,488,237, of which the patent in suit is a mere improvement, it was stated:

"A great improvement over the four pole, double throw transfer switch formerly used for this purpose (alternating the pumps). The electric connections of the four pole, double throw transfer switch are rather complicated and not every electrician can properly connect it up. The switch itself, on account of its length, has a tendency of loosening. There are more contacts to look after and if the switch is left open neither one of the pumps will operate. All this is avoided with our patented transfer sleeve."

With respect to the patent in suit it was advertised that the automatic alternator eliminates the old transfer switch or button method. It is obvious, therefore, that appellee and its assignor expressly sought to avoid the use of any electrical alternating means.

It is quite true that in appellant's device the rise and fall of the liquid in the container indirectly causes the alternation of the motors, but it does so by causing the button on the float rod to move the lever of the electric switch, which in turn eventually and directly causes the reversing switch to function.

To establish infringement there must be identity of means, operation and result. The means and operation as disclosed by appellant's device are quite different from those disclosed by the patent, and they do not come within the range of equivalents to which appellee is entitled. See Burroughs Adding Machine Company v. Felt & Tarrant Manufacturing Company, supra.

We are convinced that the claims in suit are valid but not infringed. The decree is reversed and the cause is remanded with instructions to dismiss the bill for want of equity.