### EDWARDS v. JOHNSTON FORMATION TESTING CORPORATION et al.

#### No. 404.

District Court, S. D. Texas, Houston Division.
Nov. 12, 1930.

A. M. John and Oscar Codier, both of Houston, Tex., for plaintiff.

H. F. Montgomery and Ball & Simmons, all of Houston, Tex., for defendants.

HUTCHESON, District Judge.

In this suit plaintiff alleges an infringement of patent No. 1,514,585, issued to Charles R. Edwards November 4, 1924, on application filed by him January 17, 1921. The petition seeks an injunction and an accounting.

The defendant, the assignee of E. C. Johnston, filed its answer denying infringement, and setting up the usual statutory defenses to plaintiff's patent, and by cross-action asserted the validity of patent No. 1,-709,940, and alleged infringement of that patent by the plaintiff.

On the trial of the case defendant abandoned its affirmative position and pitched its case upon two propositions, first, that the patent to Edwards was void by reason of lack of invention; and, second, that, if it was not void, it was valid only within such narrow limits as that the Johnston devices did not infringe.

In the Edwards patent the device described and claimed by plaintiff is described as an alleged "new and useful improvement in testing devices for oil wells," and in the specifications it is declared: "This invention relates to new and useful improvements in a testing device for oil wells. One object of the invention is to provide a device of the character described which is especially adapted for testing the stratum being pierced in drilling oil, gas or other wells for the purpose of determining the presence or absence of oil, gas or other fluids. With the above and other objects in view, the invention has particular relation to certain novel features of construction, operation, and arrangement of parts, an example of which is given in this specification and illustrated in the accompanying drafts."

There are six claims in the patent, on four of which, Nos. 1, 2, 5, and 6, this suit is brought.

A preliminary statement of the nature and history of the oil well drilling business in which the devices in controversy are used will be helpful in understanding the claims and properly evaluating them.

Broadly, it may be stated that these devices are used and useful in the drilling of oil wells by the rotary method of drilling. This method is described in plaintiff's brief with substantial accuracy as follows:

"A bit attached to the end of a pipe is used to make the well hole or bore. This pipe is usually called a 'drill stem.' Rotation of the pipe and attached bit in the ground produces the well hole or bore. During the rotation of the bit and pipe 'drilling fluid or mud' is pumped down through the pipe and escapes outside the pipe at a point near where the bit is joined to the pipe. The drilling fluid escaping near the base of the pipe rises to the surface of the ground by passage through the space between the outside of the pipe or stem and the earth walls of the well or bore. This passage of the drilling fluid down the pipe or tube carrying the bit and up outside of the pipe is usually called 'circulation' in the oil well drilling art. This 'drilling fluid' is sometimes called 'mud' or 'drilling mud' and is a suspension of clay or mud in water of such consistency that it will flow and may be pumped. It is fluid in its nature. The reasons for circulating the drilling fluid down the pipe carrying the bit and releasing it at or near the bit for upward passage outside of the pipe are as follows: (1) The drilling fluid passing upwardly from the bit between the pipe and the bore picks up the cuttings of the bit and carries them to the surface of the ground, thus taking out of the bore what has been cut out of the ground by the bit. (2) The colloidal suspension of clay or mud of the drilling fluid permeates the formations penetrated by the bit, and plasters and seals them from the well bore. (3) The presence of the drilling fluid in the well prevents the loose parts of the walls of the bore from collapsing or falling into the bore and destroying the hole or bore made by the bit. As the bit descends in the ground through the rotation thereof, further joints of pipe are added from time to time as the hole or bore deepens and the pipe originally attached thereto descends in the bore. Thus in a hole or bore 3,000 feet deep there is a pipe 3,000 feet long extending from the surface of the ground to the bit 3,000 feet below the surface of the ground. This 3,000 feet of pipe is rotated from the surface of the ground by any suitable means. The 'drilling fluid' is pumped down through the inside of the pipe and is permitted to escape therefrom at the base near the bit 3,000 feet below the ground level, and thereupon the drilling fluid rises again to the surface of the ground by upward passage through the space between the pipe and the side wall of the hole or bore. Well holes or bores vary in depth and may exceed 5,000 feet or more in the Gulf Coast where the rotary system of drilling is employed. As indicated above, the presence of the drilling fluid is necessary to prevent the sides of the well bore from falling or collapsing into the bore produced by the bit, but it has this objection, that the hydrostatic pressure exerted by it prevents oil or gas from entering the well bore from formations or strata exposed in the bore or hole. A column of drilling fluid exerts laterally at its base a pressure of about 15,000 pounds per square inch. Therefore, if an oil or gas bearing stratum is penetrated at that depth, and in which the oil or gas is not under a pressure in excess of 15,000 pounds per square inch then no oil or gas will enter the well hole or bore. As the depth of the well increases the hydrostatic pressure of the drilling fluid increases proportionately and therefore the oil or gas pressure in the formation must be more and more as the depth of the well increases if their presence is to be detected by simple flow from the formation into the well hole or bore."

It is the claim of plaintiff that "the utility of the Edwards invention arises because of the presence of the mud-laden drilling fluid in the well." Plaintiff makes the point as follows:

"Because of this action of the weight or hydrostatic pressure of the 'drilling mud' or 'drilling fluid' in preventing oil or gas from entering a well bore containing drilling fluid, oil or gas bearing strata may easily escape detection. The Edwards invention relieves the pressure of the drilling fluid on the formation or stratum suspected to contain oil or gas by motion of an empty pipe extending from the surface of the ground and communicating with the well bore below a seal in the well bore set above the suspected formation, the empty pipe serving as a sample chamber for oil, gas or other fluid. The seal in the well bore set above the formation suspected to contain oil or gas divides the well into two compartments, an upper compartment above the seal and a lower compartment below the seal. The seal separates the hydrostatic pressure of the upper compartment from the lower compartment. The motion of the empty sample receiving pipe establishes communication between the interior of the empty pipe and the compartment below the seal. The empty pipe being in communication with the atmosphere, relieves the pressure in the lower

compartment as soon as the lower compartment is in communication with the interior of the pipe. When the lower compartment in the well bore has been placed by the motion of the empty pipe in communication with the interior of the pipe, any oil, gas or water which may be in the suspected stratum will be able to flow into the lower compartment substantially under the atmospheric pressure and then into the empty pipe constituting a sample chamber. If the fluid pressure in the formation is sufficient the fluid will rise the whole length of the empty pipe and will flow out at the top of the pipe, or it will rise in the pipe as far as the pressure in the formation will force it."

In addition to his description of drilling operations, plaintiff also presents a history of the methods of testing employed in the business before the use of testers of the general nature involved in this suit, and his description of that history is substantially correct.

"The testimony of the witnesses on both sides clearly establishes that before the date of filing of the application on which the Edwards patent issued there were the following ways of determining when an oil bearing or gas bearing stratum had been penetrated:

"(1) A device known as the 'sand trap' was attached at the lower end of a pipe or drill stem and lowered into the bore and caused by rotation of the pipe to scoop up parts or samples of the penetrated formation. The 'sand trap' was then withdrawn from the well bore, and the sample examined by means of a microscope or other test applied.

"(2) Another method employed involved the use of a core cutter or corer (or core drill). A corer or core cutter is a hollow cylindrical body with cutting teeth at one end. In operation the teeth are rotated against a suspected stratum until the cylinder penetrates the stratum. As the row of teeth about the lower open end of the cylindrical body are in the form of a circle, a solid cylindrical mass of material enters the inside of the cylindrical body of the core cutter as it cuts its way down in the formation. The corer is then caused to grip the core of material in any suitable way and the core and corer withdrawn. A convenient way as shown by the evidence is to permit the corer to drop against the bottom of the passage cut by the corer to bend the teeth inwardly, and thereupon when the corer is pulled out of the well by the pipe or stem to which it is attached the core will be withdrawn with it. The taking of a sample by means of the sand trap and the core by a corer or core drill gives very uncertain information. Obtaining a representative sample of the material making up the formation by means of the sand trap or core cutter or core drill is a very difficult operation and uncertain in its results. Only a small portion of the formation can be withdrawn from the well and it is subject to being contaminated by drilling mud and may become mixed with solid matter from other formations and further the sand trap or core cutter may become filled with material from other formations before the suspected stratum is reached to make the test. Often the character of the formation or stratum is such that a specimen or sample of it cannot be withdrawn by means of a corer or sand trap.

"(3) Another method of detecting the character of the formation penetrated during the drilling was to examine the cuttings from the bit which are washed up by the drilling mud. For this purpose the drilling mud rising out of the well was allowed to flow into a receptacle where the cuttings were allowed to settle. These cuttings were examined and an estimate made of the character of the formation penetrated. It will be readily observed that this test was very likely to prove uncertain as the cuttings after removal from their formation or stratum were mixed up with drilling fluid and contaminated thereby and furthermore it was impossible to know with accuracy just exactly from what part of the well bore the cuttings were removed.

"(4) A fourth method of gaining some idea of the formation penetrated was to lower a bailer in the well to withdraw the liquid from the bottom of the well. A bailer is nothing more than a long bucket of small enough diameter to be let down into the well bore by means of a cable. There is a dart valve in the bottom of the bucket (bail or bailer) which opens the bottom of the bucket as the bailer descends. The valve closes when the bailer is withdrawn. The action of a bailer is like lifting water out of a well with a bucket. Bailers are usually open at their top like a bucket and hence fluid may also enter from the top. The dart valve is useful mainly for the purpose of emptying the bailer after it has been lifted to the derrick floor. This emptying is accomplished by allowing the dart of the dart valve to strike the floor thereby opening the valve at the bottom of the bailer and permitting liquid to escape. The bailer, being nothing but a bucket, only extracted from the well bore what was actually in the bore at the place the bailer

became filled. As the usual bailer is open at the top it would be very difficult to say from what part of the bore the liquid in the bailer was obtained. The bailer clearly could not withdraw anything from the formation surrounding the well bore or hole because the pressure of the column of drilling fluid in the well would prevent the entry of oil from the side walls. It could not test a well any more satisfactorily than an ordinary bucket.

"None of the four preceding ways or means for determining the productivity of a stratum or formation were certain in operation. Each of them involved a considerable amount of guesswork in interpreting the result of the test. Some would say that a 'pay' sand had been reached, while others would say to the contrary. As Doolan said 'It would indicate whether we had enough to justify us to test it or not.'

"(5) The fifth and last method or means of the prior art for determining when a 'pay' stratum had been reached in boring a well and what was regarded as 'the' test for which the foregoing were preliminaries, was by means of setting casing. In making this test a metal casing was inserted into the well bore down to a shoulder of a reduced bore just above the formation suspected of containing oil or gas. The inside of this casing was then bailed or emptied of drilling fluid by means of a bailer. This removal of the drilling fluid from the inside of the casing removed the weight or pressure of the drilling fluid from the formation and, consequently, any gas or liquid in the formation could flow into the inside of the casing under its own natural pressure. This was comparatively certain in its results. If oil or gas were present in the formation it usually ran into the casing and was easily detected therein, being removed by the bailer, or forcing itself to the surface of the ground through the casing. However, this method or means of testing a well involved, as will be seen, the setting of casing. If the stratum or formation to be tested was 3,000 or 5,000 feet below the surface of the ground, then 3,000 or 5,000 feet respectively of casing must be set, as the casing must extend down to the formation. The cost of setting 3,000 feet of casing is about $3,000 to $4,500. Now, if the stratum or formation tested does not yield oil or gas, then this setting of casing has been futile, and the large expenditure in money and time in setting the casing is lost, because only very infrequently is it possible to withdraw the set casing from the hole or bore. There is another drawback or defect in the setting of casing and that is if the stratum is not 'pay' stratum and the casing cannot be pulled out of the bore, further drilling must proceed with a reduced bore, since to enable further boring a smaller bit must be used which is capable of descending through the casing which has been set. This test also has the further disadvantage that it takes considerable time to bail out a deep well, for example a well 4,000 to 5,000 feet deep. However, in spite of these greatly objectionable features, the casing setting test will usually reveal whether or not there is a 'pay' stratum or formation. It will usually show what is in the formation, whether oil, gas or water or nothing."

As originally declared on, the claims were as set out in the patent, but before the case went to trial plaintiff attempted to limit three of them, 1, 5, and 6, by filing a disclaimer consisting of introductory words limiting the claims to apparatus for testing the productivity of strata in a well being drilled by the rotary method, and the four claims on which the cause went to trial read as limited by the disclaimer:

One. "(In an apparatus for testing the productivity of a stratum exposed in a well while containing drilling fluid which might substantially prevent a flow from said stratum) the combination with a packer adapted to be set in a well bore of a stem provided to be inserted through said packer and adapted to communicate with the bore beneath said packer (to relieve pressure of said fluid against said exposed stratum and permit fluid to be forced from the stratum below said packer)."

Two. "The combination with a packer adapted to be set in a well bore, of a tubular stem fitted through said packer, and normally blocking the same against the passage of fluid therethrough, the lower end of the stem being provided with an inlet through which the stem communicates with the bore beneath the packer when the stem is lowered through said packer."

Five. "(In an apparatus for testing the productivity of a stratum exposed in a well while containing drilling fluid which might substantially prevent a flow from said stratum) the combination with a packer adapted to be set in a well bore and having an internal fluid passageway, of a stem adapted to be inserted into said passageway to block the same, said stem being adapted to be lowered through the packer, and when in lowered position communicating with the bore beneath the packer and adapted to permit the fore-

ing of fluid through said stem from the strata below said packer."

Six. "(In an apparatus for testing the productivity of a stratum exposed in a well while containing drilling fluid which might substantially prevent a flow from said stratum) the combination with a packer adapted to be set in a well bore of a tubular stem fitted through said packer and normally blocking the same against the passage of fluid therethrough, the lower end of said stem being provided with an inlet which is closed when the stem is in said blocking position, said stem being capable of being lowered beneath the packer, and when in lowered position to communicate through said inlet with the bore beneath the packer."

At the trial plaintiff claimed, citing Radio Corporation v. Twentieth Century (C. C. A.) 19 F.(2d) 290, that the disclaimer was unnecessary; that the claims would necessarily be construed in the light of the specifications, which would limit them just as the disclaimer had done.

While I do not believe it important to determine this question, as I believe plaintiff had a right to file his disclaimer when he did, Marconi v. De Forest (C. C. A.) 243 F. 560; Michigan Carton Co. v. Southerland Paper Co. (C. C. A.) 29 F.(2d) 179, I believe that plaintiff is right in his position that the disclaimer was unnecessary, and that, construing the claims in the light of the specifications, they are necessarily limited to the purpose set out in them; that is, for the testing of strata being pierced in drilling for oil, gas, or other wells for the purpose of determining the presence or absence of oil, gas, or other fluids therein.

Defendant, attacking plaintiff's claims as void for want of invention, cites many prior patents in support of the attack, and further insists that, if plaintiff's patent is valid at all, it is only for the precise improvements set out and described in it, and cannot be construed to cover the devices used by Johnston which, while in the same art and designed, as Edwards' is, to test formations in the drilling of oil wells, are so differentiated in form and substance from plaintiff's patented device as not to constitute an infringement thereof, and that this has been recognized by the Patent Office in granting to Johnston in 1927 patent No. 1,709,940.

Plaintiff, realizing that there is a difference in operation between his device and that of Johnston's, insists that this difference is not in function, but in mere mechanical detail, and, boldly pitching his case upon the proposition that he is a pioneer, insists that his invention is entitled to the broadest range of equivalency and easily covers defendant's structure.

It is in evidence that on June 28, 1927, three months after Johnston had filed his application for patent, Edwards issued a warning notice to the oil fraternity in which he used these expressions "This patent has very broad and basic claims in the new art of flow testing the contents of any sand penetrated in a mudfilled well;" and in which he stated: "You will note that since this is probably the very first patent in the new art of flow testing a sand in a drilling well without first bailing out the mud, that the courts will be inclined to give a very liberal and broad interpretation to these and the other broad and basic claims of the above patent. Also you will note that the few elements— a packer and a stem adapted at will to permit fluid to flow from the sand are about as few elements as can possibly be used by any testing device. It also appears rather futile for anyone to attempt to produce a tester that does not infringe the broad claims of this patent." And further: "Don't allow anyone to kid you by saying that the combination is old and that packers have been used for ages in oil wells; just ask 'em to explain how an ordinary packer and stem if set in a mud filled well will relieve the mud pressure on the prospective sand unless, as explained, means are provided to have an empty stem after the packer has been set and this sand thus relieved of all mud pressure."

On the trial plaintiff makes the same broad claim which he made in the above warning letter, and in support of the claim develops a history of oil field operation, particularly with reference to testing methods employed prior to the general coming into use of plaintiff's and defendant's devices, and, to the defendant's claim that earlier patents have anticipated him, plaintiff asks how it is that, if these earlier patents really did do so, testing methods similar to his were not in use until testers like those in suit commenced to be employed.

Defendant replies that the reason testers were not used earlier was just a condition of the business of oil well drilling; that it had no relation to the presence or absence of available devices prior to the time that the industry was ready to use them, and they point to the fact that, upon plaintiff's own proof, he himself had used one of these devices nearly ten years before they came into general use, had made his application for pat-

ent in 1921, had gotten his patent in 1924, while Cox had gotten his even earlier, and that there is no record of any commercial use of his or any other similar device until 1927; that plaintiff's effort to explain this situation by the proof that he was in financial difficulties until 1927 with no money to market his device will not do, for the facts are, defendant says, that, when the industry was ready for the device, not only plaintiff's and defendant's but those of many others, commenced to be used, while before it was ready for it neither plaintiff's nor any other device was used.

It seems to me that there is much of substance in defendant's contention, and that, if the coming into existence of the device of Edwards' had been the determining factor in the employment of this method of testing structures, it would have come into earlier use. It is more likely that here was an evolution and not a revolution. The facts are that by 1927 the industry had become more carefully organized both in the matter of preliminary investigation and of more scientific drilling, more careful methods had become established, and those charged with the execution and management of the field operations were looking for and ready to use and did then commence to use the best devices available for testing strata. Standard Oil Co. v. Oklahoma Natural Gas Co. (C. C. A.) 284 F. 469; Carbide & Carbon Chemicals Corp. v. Texas Co. (D. C.) 21 F.(2d) 199, 200.

Certainly plaintiff could not support his claim of broad invention by proof of its general acceptance and use after and as a result of his invention, for at the time it commenced to be used not only had plaintiff's device been in existence, according to his testimony, for eight years, but there was that of Cox and others before him, of Johnston and many others after him, while the proof does further show that the plaintiff himself is not using and has never commercially used the device which his specifications and drawings describe, but a departure, perhaps allowable, but none the less a departure therefrom.

I think it must be said, on the whole, that, if plaintiff did invent anything, it was nothing revolutionary or of a pioneer nature, but merely a device differing, not broadly, but narrowly, in form, structure, and function, from previous devices known in the well drilling and operating art.

Defendant cites against plaintiff many prior patents, not in different arts from this, but in the same art, that is, well drilling and production, where for many years, differing to some extent in form, but substantially the same in operation and function, devices have existed for sealing off portions of the well for the purpose of controlling the flow of fluids into and out of the well. While only a few of these patents describe themselves as "designed for the purpose of testing strata," the operation through the use of sealing means and the introduction of fluid into a protected chamber below the sealing means is so like that of plaintiff's as to fully anticipate all broad claims of invention. Some of the later ones granted shortly prior to plaintiff's were issued for the express purpose of well testing and in principle cover plaintiff's device so completely as that it makes it very doubtful whether the difference between them and plaintiff's is not merely one of form and not at all of function.

Among the earlier patents relied upon as against plaintiff's broad claims may be mentioned patent No. 263,330, issued to Franklin August 29, 1882, patent No. 1,000,583, to Cooper, issued August 15, 1911. The Franklin device, while described as a device for drilling and regulating the flow of oil wells and designed to have application in Pennsylvania fields where the rotary method of drilling was not employed and therefore was unconcerned with the presence of a drilling fluid in the well, still was described as "a device for regulating or controlling the flow of oil wells" and as "consisting of a device which can be connected with the tubing of the well, either within or without the well, but preferrably within, at a point above the packer, which has within it a damper or valve which can be opened or closed by turning the tubing part way around." He emphasizes the fact that his device would close the tubing while it was being withdrawn, and states: "My device has to be operated manually but it may be placed deep in the well and thereby obtain considerable advantage." He also states: "It will be seen that my device can be operated from the top of the well by turning the tubing, as stated above, that the oil can be shut off by it or allowed to flow at will, that the device can be kept closed while the tubing is being put into the well and then opened and can be again closed when the tubing is to be drawn." This device, though designed for and used, not for the purpose of testing strata, but to regulate and control the flow of oil wells, had in it practically every suggestion of plaintiff's, and witnesses testified, and I think established, that it could have been taken as it was

or with mere mechanical adaptation and actually used in a rotary well as a tester.

The patent to Cooper was, with reason, more strongly relied upon by the defendant. This patent was for an improvement in packers for oil and other wells, and, though generally described as a packer for operating gas, water, and oil wells, it declares: "By this method of procedure a well can be tested for the presence of oil or gas by pumping which could not be done if a flood of surface water was entering the well which the pump or bailer was incapable of removing." In most of the claims of this patent it is declared that a part of the device consists of a flow pipe extending from the mouth of the well through the packer and into the well below the packer and means operable from the mouth of the well to open and close the lower end of the flow pipe. Testimony was offered as to this patent that it could be operated as a tester substantially as plaintiff's patent is operated and plaintiff sought to avoid the effect of this testimony by the claim that the Cooper device could not be operable in a well below a thousand feet, while defendant offered testimony to the contrary, which I incline to credit, that it could be operated at any depth, but, in the view I take of the case, I think it wholly immaterial to determine whether the Cooper patent as described would operate below a thousand feet or not, for it gave the plaintiff and any others such information, in the light of the state of the art, as to the theory of the process as that to make it operative at 3,000 feet or any other depth required the exercise of no inventive genius, but merely the application of mechanical trial and error to adapt the device for use at any required depth.

But this is not all. On July 27, 1920, there was issued to E. H. Cox patent No. 1,347,534. This patent describes an invention relating to improvements in well drilling, particularly to "a device for testing wells in order to ascertain if oil, water, gas and other liquids are under the path of the drill or in proximity thereto, that is the stratum which has not been disturbed or only partially disturbed by the drill bit; to provide means for procuring and bringing to the surface a small quantity or sample test of such water, oil, gas, etc."

So complete is the disclosure of this patent that whatever may be said about its inoperability or the inoperability of the particular form described in the specifications and shown in the drawings because of something over or under in its description, not only any ordinary mechanic, but the proverbial wayfaring man, with that patent in hand, and with the earlier patents to aid him, would not err in the way, for he could easily devise some method of doing the very thing which plaintiff claims his device does, and, while it may be that in view of his patent plaintiff should have protection limited to the very device he describes and shows, it is perfectly plain to me that no broad protection may be accorded him. The Cooper and other patents had already told him of means operable from the mouth of the well to open and close the lower end of the flow pipe. Cox used means which plaintiff says were not operable, but other patents used the turning system almost precisely that which plaintiff uses, so whether Cox's was operable or not seems to me to be wholly immaterial, for it clearly and fully anticipates any broad claim to pioneer invention in that field, and leaves the case for decision only upon two points: First, whether plaintiff's claim, construed narrowly as limited by its specifications and drawings, is infringed by defendant; and, second, whether, if infringed, it is valid.

Here plaintiff finds himself, like Agag, stepping delicately. If he bears too hardly for broad patent construction, he puts himself in the position of perhaps finding his patent invalid because broadly anticipated by Cox. If he urges against the anticipation of the earlier patent, the presumption of validity which the grant of his subsequent patent gives him, at least to the device which it shows, he finds himself confronted by an adversary, the defendant, who, presenting his own subsequent patent, claims the presumption of validity for it to the device shown.

Thus circumstanced, plaintiff finds himself teetering first toward the side of broad construction, to overcome the junior patent, and then to the side of narrow construction, to overcome the senior, and to say the least of it is hard put to it.

Further, plaintiff finds his position more complicated by the fact that the forms of the device which he now employs in commercial practice are not those shown in the drawings and specifications of his patent, that the device of his patent was never commercially used, and that he is now seeking not only to protect himself in the presently used device as an equivalent to that shown in his patent, but through the similarity of the presently used device to that of the Johnston is seeking to extend the doctrine of equivalence from his patent description to the device now

used by him, and having done so, by a further step to that of Johnston.

Plaintiff's effort in this regard is not helped by the fact that the Patent Office, after full investigation, has granted to Johnston a patent on his device. Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 23 S. Ct. 521, 47 L. Ed. 689; Century Electric Co. v. Westinghouse (C. C. A.) 191 F. 350. While it is true the grant of a subsequent patent does not raise in law any controlling inference of noninfringement, Wisconsin-Minnesota Gas Co. v. Hirschy Co. (C. C. A.) 28 F.(2d) 838, in determining the question of infringement as a fact, the action of the Patent Office in granting the patents, and the disclosures of the file wrapper, are entitled to weight in determining the fact question of whether, between the two devices, there is a substantial difference in function.

On the whole case here, it is my opinion that, if plaintiff has any right to protection, it is not by virtue of his claims alone, for they, if unaided by his specifications, would be so broad as to be fully anticipated, but under his claims as limited by his specifications, and that, if plaintiff's patent is valid at all, it is merely for a combination into which a new operable element, not the equivalent of Cox's patent, has been introduced, and, so limited, he cannot claim infringement on the part of Johnston, for Johnston himself has introduced as plaintiff has, a new functional element in operability. Hyman v. Woolworth Co. (C. C. A.) 28 F.(2d) 833.

I have not found it necessary to determine, and I do not determine, whether plaintiff's patent is valid as to the precise device shown in it. Having found that, if valid, it is not infringed, it follows that plaintiff is not entitled to any of the relief prayed, and that his bill should be dismissed for want of equity, and it will be so ordered.