**JOHNSTON FORMATION TESTING CORPORATION et al. v. HALLIBURTON et al. \***

No. 7991.

Circuit Court of Appeals, Fifth Circuit.

Jan. 9, 1937.

Rehearing Denied Feb. 23, 1937.

\*Writ of certiorari denied 57 S.Ct. 784, 81 L.Ed. ——.

D. A. Simmons, of Houston, Tex., and J. N. Saye, of Longview, Tex., for appellants.

Leonard S. Lyon and Henry S. Richmond, both of Los Angeles, Cal., and Ben F. Saye, of Duncan, Okl., for appellees.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

Erle P. Halliburton and Halliburton Well Cementing Company sued Johnston Formation Testing Corporation and E. C. Johnston for infringement of patent No. 1,930,987, which was applied for by John T. Simmons, alleged inventor, February 10, 1926, but not granted till October 17, 1933. Simmons before applying for the patent assigned an interest to Henderson, but within three months after the application was filed they had assigned first partially and then wholly to Halliburton. The patent covers a method and an apparatus for testing the productivity of formations encountered in drilling oil and other deep wells. The defendants also have patents, granted while the Simmons patent was pending in the Patent Office, under which the alleged infringing apparatus has been used and operations conducted. We read in the proceedings in the Patent Office the statement of Halliburton that twenty patents had been granted in this particular testing art while the Simmons patent was pending, which makes apparent the great activity at this period. It appears in the record that both Halliburton and Johnston and their companies make thousands of these deep well tests and no doubt there are others making them also. Evidently, since Halliburton claims all others to be infringers of the Simmons patent, the monopoly contended for would if established very seriously affect many persons and businesses. In Edwards v. Johnston Formation Testing Corporation (D. C.) 44 F.(2d) 607, affirmed (C.C.A.) 56 F. (2d) 49, the present defendants were sued by Edwards, the patentee in No. 1,514,585 issued November 4 1924, and therefore antedating the Simmons application some fifteen months. The holding was that neither Edwards nor Johnston were pioneers in the well testing art, that Edwards had not a basic patent, but was only an improver, and his monopoly was limited to his improvement. It is now claimed that the Simmons invention is basic at least in the employment of a single string of

pipe to make the test, and in trapping in it an uncontaminated sample from the bottom of the well.

 / Seven claims only were originally made by Simmons, all for an apparatus and none mentioning the single pipe string as an element. They are not here asserted to be infringed. Claims 8 to 19, inclusive, for method and apparatus, are relied on. They (or their predecessors) were twice rejected by the examiners as anticipated by other patents and twice rewritten in the effort to differentiate or narrow them. They were as now presented again rejected, but on appeal to the Board of Appeals they were allowed, and the patent issued. The decision of the Board of Appeals was followed by the District Judge in this case, but in Halliburton v. Honolulu Oil Corporation (D.C.) 18 F. Supp. 58, in the Southern District of California, Judge Cosgrave thought the method claims 8 and 18 were invalid and the apparatus claims if valid were to be restricted to the form disclosed and not infringed, following our conclusion in the case of Edwards v. Johnston Formation Testing Corporation, supra. We are of opinion that Judge Cosgrave's conclusion is correct and will state as clearly and as briefly as possible our reasons.

The drilling of very deep wells by the rotary method which has come into extensive use only during the present century, and the methods of testing the strata pierced practiced before the invention of Edwards, including the use of packers, "rat-holes," and sampling chambers, are described in the opinions in 44 F.(2d) 607, and 56 F.(2d) 49 and need not be repeated. Several of the older patents brought forward in this case were there discussed. What was said of them in relation to the Edwards and Johnston patents is largely true as to the Simmons patent which came into the same art at nearly the same time that Edwards and Johnston did. We will again discuss some of them as specially bearing on the Simmons' claims. Of the method claims 18 is representative, as

copied in the margin. * It assumes familiar apparatus and claims a monopoly on a new use of the old apparatus to achieve a result in a better way. That apparatus includes a single string of pipe lowered into the well (the drill stem is always present and usable), a packer on the string (either a rat-hole or an expansible packer), and a valve (of any appropriate kind) at the lower end of the string. These three simple and well-known elements are to be used by lowering the pipe into the well with the valve closed against the drilling fluid until the packer is set, then by opening the valve to admit cognate fluid below the packer, then by closing the valve so as again to prevent the drilling fluid from entering when the packer is released and the pipe drawn up with its contents. Thus broadly claimed (improved apparatus being put out of mind), no novelty and certainly no invention can be claimed for the method. Packers and pipes with valves in them have long been in use to get what is below the packer free from what is above and without removing what is above. Whether a large quantity is taken from a finished well or a small sample from an unfinished well does not materially alter the method nor the function of the elements used. There has always been water encountered in oil wells; and the drilling fluid is only very muddy water voluntarily put and kept in the well for special reasons instead of running in from natural sources. Expansible and removable packers with pipes through them to reach the oil, gas, or other desired fluid beneath are shown in the Stewart patents, No. 171,589, December 28, 1875; and No. 230,080, July 13, 1880. "Rat-hole" packers set by the weight of the piping pressing them down and removable by simply lifting them are shown in Koch, No. 208,610, October 1, 1878; Bloom, No. 785,933 March 28, 1905; and McCready No. 1,522,197, January 6, 1925. The Cooper patent, No. 1,000,583, August 15, 1911, shows a collapsible packer used to separate water above from what is to be gotten below. The pipe carries a

---

* "18. A method of testing the productivity of a formation encountered in a well containing drilling fluid involving the insertion of only a single string of pipe into the well to make a test, which includes lowering a test string into the well through the drilling fluid with a packer carried by the string and a valve inlet at the lower end of the string closed against the entrance of fluid from the well, setting the packer above the formation and opening the valve to permit cognant fluid from the formation to enter the inlet, closing the valve to prevent the subsequent entrance of fluid from the well through the inlet and releasing the packer, and raising the test string with the inlet closed against entrance of fluid from the well to remove an entrapped sample."

valve to be opened and shut from the surface, but the device is complicated. We find the simplicity of the Simmons method, along with all its operations, reasonably disclosed in the old patent to Franklin, No. 263,330, August 20, 1882. There is the single pipe, with a packer mentioned but its function esteemed so familiar as to need no emphasis, capable of being lowered into and withdrawn from a well, with the entrance into or escape from the pipe to be controlled by a valve operated from above while the pipe is lowered into or withdrawn from the well. The importance of Franklin to this method claim is that he describes the use of a packer on a single string of pipe with a valve in the pipe in the very operation of putting them in and taking them out of the well. We do not agree with the Board of Appeals that Franklin does not disclose a packer. It is mentioned. Evidently one must be used for without it oil would never flow through the pipe as desired and there could be no use of the valve to control the flow. The packer is necessary to prevent the escape of gas and build up pressure to make the oil flow. It would serve also to cut off water or dirt from above though Franklin does not mention this. We agree however that Franklin did not intend to get a sample from the well by raising the pipe, but intended to keep from getting a sample that way by making his valve a leaking one that would let the contents escape as the pipe is raised. He expected to get what was below the packer by a natural flow, just as Simmons in his disclosure says it is to be preferred; and that is what Simmons got in his first three actual tests, it being gas. But we think that just as Simmons, when the fluid beneath whether gas or oil will not flow, closes his valve and raises his pipe to see what is in it, so one using the Franklin equipment could proceed if he wished to see what was in his pipe.

It would take no invention with such a change of purpose to substitute a valve that would not leak for the one that does leak on withdrawal. Nor do we think it would be invention for one having a Franklin device to use it to sample a well through drilling fluid instead of using it to flow the well through water or air above the packer. Especially after the disclosures of Cox, No. 1,347,534, July 27, 1920, and Edwards, No. 1,514,585 November 4, 1925, in this very art of testing strata in deep rotary drilled wells by sample taken through the drill stem, with their somewhat complicated devices, we do not think that recurrence for this new use to what is in substance the simple apparatus of Franklin ought to be the foundation for broad method claims such as are here put forth. We hold them, while perhaps not strictly anticipated, to involve no such invention as entitles to monopoly.

The apparatus claims have a different status. They propose a new machine to better accomplish by its employment the useful result. The inventor Simmons, as already stated, put forth seven such claims as his conception of what he had invented. They are not alleged to be here infringed and we express no opinion about them. So soon as Halliburton acquired an interest in the invention, his attorneys added the much broader claims. Claim 15 copied in the margin is typical. † On June 17, 1927, to distinguish prior patents the claims were rewritten so as to state for the first time that only a single string of pipe is to be used. Edwards thought there were advantages in having more than one pipe string, in which he may be wrong, but again in view of the oil well art we do not think that the omission of the Edwards second pipe to maintain circulation can be said to involve such invention as to give a monopoly of all single string testers as is here claimed. It may be a simplifying improvement on which a combination patent may rest, but is not a basic and pioneer invention. Positive pressure of the packer against the well walls, also written into the claims, appears to refer to the weight of the pipe on the rat-hole packer, but that is the way a rat-hole packer has always

† "15. Apparatus for testing the productivity of a formation encountered in a well containing drilling fluid, comprising a single empty string of pipe to be lowered into the well through the drilling fluid to adjacent the formation to be tested, a packer lowered into the well by said string of pipe for sealing off the drilling fluid from the formation to be tested, said packer adapted to be positively pressed against the walls of the formation to seal off the same, means at the lower end of said string of pipe to receive fluid from said formation including an inlet opening into said pipe below said packer and a valve structure for controlling the inlet, said valve structure having a relatively stationary part connected to the packer and a relatively movable part connected to the pipe."

worked. We do not think the claims following the first seven can be sustained in all their breadth, but must be limited to the form of apparatus disclosed. Johnston does not use a stop cock valve, nor actuate it by turning the string of pipe, but his means of trapping and withdrawing the sample are substantially different from those disclosed by Simmons. The Johnston apparatus does not infringe.

We have rested the decision upon the grounds already stated, but we have grave doubt that Simmons is the original and sole inventor of the method and apparatus sought to be patented. He gives a strange account of the conception and development of what is now said to be a revolutionary idea. It arose neither from experience, experiment, nor study. It was not either "a leap or a step" in the progress of the art, but a stumble in the dark. He says he was not thinking of testers at all, never saw one and knew nothing of them, but was thinking of a float valve to prevent a drill stem from collapsing. In September, 1925, he made a rough model of his rotary-valve tester out of two wooden spools, and about the last of October approached S. E. Carter, whom he had known twenty years, to furnish money to get a patent, which Carter said he would do so soon as he got in funds about the first of the year. In January Carter said he could not spare the money and Simmons went to Henderson, who advanced him $11 to have Eby Engineering Company in the same town to make three blueprints, without dimensions, the bill for which is dated January 22, 1926. One of these was taken to a local machine shop and from it a blacksmith is said to have made forgings and a single machinist to have fabricated a full size tool all by February 2, on which date $60 was paid in full of an invoice worded "Special 4"x 6⅝" Rubber Packer as instructed $60.00." Another blueprint was sent to Washington with application for the patent on February 10, 1926. Simmons says that Carter did not mention to him that he was helping one Philp, also an old acquaintance of both, in the same town and in the same machine shop to get made a similar full size tool and that the very same Eby Engineering Company had made Philp similar blueprints, one of which Philp had sent to Washington with application for patent on November 23, 1925. Carter, on the other hand, says that he and Philp had

been working on the Philp tester since early in the spring or summer and the machine shop worked on it at odd times for many weeks, Carter not having money to pay for it; that Philp gave up his application for patent on receiving from his attorneys in Washington copies of the Cox and Edwards patents, and that the matter was then put in Simmons' hands, he being in Carter's employ. The secretary-treasurer and part owner of the machine shop, who severed his connection with it on November 30, 1925, testified fully by interrogatories to having had the tool made for Carter and Philp at odd times during the early part of 1925 before he left under a special arrangement for credit with Carter, and that they made the metal part but put no rubber packer on it. The judge ruled out his testimony that the metal part could not be made with all modern machinery for $60 and that the packer to go on the tool to hold the water back would cost $60 in his opinion. It does not appear why this testimony was excluded, but we think it ought to have been admitted. It fairly appears that the witness was in position to know the cost of machine work and packers and since no one testifies to making out the $60 invoice or why, if it referred to the whole tool, it should be described as a "rubber packer 4" x 6⅝"," language which is appropriate to a frustro-conical rubber mass of diameter 4"at the small end and 6⅝" at the larger, but which does not well describe a metal tool several feet long with no such metallic dimensions. The machinist Butler mainly corroborates Simmons, though he admits that the working hours between the making of the blueprint and the receipt on the $60 invoice were hardly sufficient for the machine work, and that the time of himself and the machines at the usual rate would be worth several times $60. The former bookkeeper and the foreman of the machine shop both corroborate the ex-secretary-treasurer and Carter. No one says that more than one tool was ever made there. Philp got to the trial late and was restricted to surrebuttal testimony and did not get to say much. But his blueprint and the correspondence with his patent lawyers in Washington are in the record. We agree with the trial judge that Philp and Carter abandoned their interest in the whole matter, but we cannot think that this bookkeeper, this foreman, and the former secretary-treasurer of the machine shop who have no interest and are not im-

peached ought to be disregarded. They all fix the date by that of the leaving of the secretary-treasurer, and what he knows must have happened before he left. The blueprint and patent application of Philp went to Washington seven days before he left. Inventors working independently on the same problem have sometimes hit on substantially the same solution; but that in the same town two such, well acquaint-. ed with each other, should appeal for help to the same man, go to the same engineer for drawings and to the same shop for a completed tool, and be able somehow to merge both into one without any inter-communication is too much of a coincidence. It seems more reasonable to conclude that Philp's tester with its sleeve valve as shown in his blueprint was not workable, and that it was abandoned, and that Simmons did substitute a better valve —his disc rotary stop-cock—shown in his blueprint, and that the machine shop, after experimenting with the Philp tool, was able to make one for Simmons more expeditiously than would have been otherwise possible, re-using parts of it! It may even be that the $60 invoice is more for the rubber member than for the tool, for all say that no rubber was ever put on the Philp tool. While this might entitle Simmons to credit for an improvement in the mechanism, the idea of using one string of pipe with a valve to be closed and opened by rotating the pipe to entrap a sample below the packer was the idea of Philp. Though the evidence is not clear and a patent ought not lightly to be upset on such a ground alone, we are satisfied that no wrong is done Simmons and his assignees in denying him a broad and basic patent.

The judgment is reversed and the cause remanded, with direction to dismiss the bill.